*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

CURTIS DEL-JR ROBINSON,

      Defendant-Appellant.

UNPUBLISHED
September 09, 2025
2:46 PM

No. 370036
Wayne Circuit Court
LC No. 23-003992-01-FC

Before: ACKERMAN, P.J., and M. J. KELLY and O'BRIEN, JJ.

PER CURIAM.

Defendant, Curtis Robinson, appeals as of right his jury-trial convictions of assault with intent to do great bodily harm less than murder, MCL 750.84(1)(a), and possession of a firearm in the commission of a felony (felony-firearm), MCL 750.227b(1). Because there are no errors, we affirm.

## I. BASIC FACTS

In the early morning hours of July 30, 2023, Robinson shot Diamond Tinsley six times. The prosecution's theory was that Robinson repeatedly shot Tinsley with the intent to kill her while she was leaving his property. In support, it presented evidence that, just after midnight, Robinson's estranged wife arrived at his house unannounced. While Robinson was arguing with her, his new girlfriend came outside. Robinson yelled at her to go back inside, but she did not. Robinson then "tussled" with his girlfriend. Additionally, Robinson, who had a concealed pistol license, placed his gun on a grill that was on the porch.

Robinson's wife was hysterical and irate over the fact that he had a "bitch over here." She got out of her vehicle and started talking to Robinson's girlfriend. Robinson's girlfriend claimed that she was Robinson's fiancé. Both women cell-phoned friends.[1] Robinson's girlfriend called

---

[1] It is unclear whether Robinson's wife called Tinsley before or after she started talking to Robinson's girlfriend.

her friend, Kylan Bonnett, and told him that she wanted to be picked up because Robinson's "ex-wife" was at the house. Robinson's wife called Tinsley. Tinsley testified that Robinson's wife was screaming and "really hysterical." In response to the call, she drove to Robinson's house. When she arrived, Robinson's wife was standing on the sidewalk with Robinson. Tinsley had a gun between her waistband and her shorts, but she transferred it to a so-called "fanny pack" so that it would be more secure. Robinson apparently saw her transfer the gun and said to her "don't do that."

After Tinsley arrived, Robinson's girlfriend struck Robinson's wife in the head with a liquor bottle. Tinsley and Bonnett tried to break up the fight. Tinsley recounted that Robinson's girlfriend hit her and that she hit her back. She also stated that at some point, Robinson hit her in the head hard enough to cause blood to drip down her face. Tinsley turned to Robinson's wife and said, "bitch, let's go." Tinsley said she started pushing Robinson's wife toward her car. As she did so, she saw Robinson grab his gun and point it at her. She taunted, "Oh, you going to shoot me?" She then pivoted her upper body to look back over her left shoulder. When she did that, she heard "the shots" ring out from Robinson's gun. Tinsley was shot six times, including in her arm and back. She explained that she and Robinson's wife got into the car and went to the hospital.

After the shooting, the police responded to a "shots spotter event" at Robinson's house. Robinson told the officer that "his wife came to the location with a male that fired off rounds and left." Robinson did not state that he had fired any shots. Before the police left, they recovered a shell casing from the area in front of the house. After they spoke to Tinsley at the hospital, they returned to Robinson's house and arrested him.

The defense contended that Robinson was acting in self-defense. Robinson testified that when Tinsley arrived at his house, he was holding his wife's arms to prevent her from hitting him. Tinsley told him to get his "hands off [her] mother-fucking sister." He responded that he did not know Tinsley, that he was holding his wife, and that if Tinsley were his wife's "sister" she should take her home. He stated that Tinsley then grabbed his wrist and that when he looked he saw that she had a gun in her right hand. It was pointing down. She then "put one round in there." Robinson let go of his wife. As he backed "up on [his] porch to retrieve" his gun, he told Tinsley to put her gun down. He grabbed his gun because he was "scared for [his] life."

According to Robinson and Bonnett, after Tinsley and Robinson grabbed their guns, Robinson's girlfriend and wife started to fight. Tinsley entered the fight by punching Robinson's girlfriend and hitting her in the head with her gun. Robinson stated that he then blocked Tinsley's arm and punched her. Tinsley responded by telling Robinson's wife, "I'm about to kill this nigger." At some point, Tinsley "racked her gun." Robinson told her to leave. He claimed that when Tinsley was three to six feet away, she aimed her gun at him. Robinson testified that in response, he fired three to five shots at her, which caused her to run away. Robinson's testimony was corroborated by Bonnett, who stated that Tinsley pointed her gun at Robinson while Robinson's gun was pointed at the ground. He further testified that Tinsley waved her gun "back and forth, mainly at" Robinson. He said Robinson then fired four or five shots.

Following a jury trial, Robinson was convicted of the lesser included offense of assault with intent to commit great bodily harm and one count of felony-firearm. This appeal follows.

## II. SUFFICIENCY OF THE EVIDENCE

### A. STANDARD OF REVIEW

Robinson argues that the prosecution did not introduce sufficient evidence to demonstrate that his shooting of the complainant was not justified by self-defense. This Court reviews de novo a defendant's challenge to the sufficiency of the evidence. *People v Hawkins*, 245 Mich App 439, 457; 628 NW2d 105 (2001). In doing so, we review "the evidence in the light most favorable to the prosecution" to determine "whether there was sufficient evidence to justify a rational trier of fact in finding guilt beyond a reasonable doubt." *People v Harris*, 495 Mich 120, 126; 845 NW2d 477 (2014). "The standard of review is deferential: a reviewing court is *required* to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Oros*, 502 Mich 229, 239; 917 NW2d 559 (2018) (quotation marks, citation, and alteration omitted).

### B. ANALYSIS

The elements of assault with intent to do great bodily harm less than murder are: "(1) an attempt or threat with force or violence to do corporal harm to another (an assault), and (2) an intent to do great bodily harm less than murder." *People v Russell*, 297 Mich App 707, 721; 825 NW2d 623 (2012) (quotation marks and citation omitted). "The elements of felony-firearm are that the defendant possessed a firearm during the commission of, or the attempt to commit, a felony." *People v Johnson*, 293 Mich App 79, 82-83; 808 NW2d 815 (2011) (quotation marks and citation omitted). Robinson contends that he acted in self-defense. Self-defense can be raised as a defense to assault with intent to do great bodily harm less than murder, *People v Stevens*, 306 Mich App 620, 628, 630; 858 NW2d 98 (2014), and as a defense to felony-firearm, *People v Goree*, 296 Mich App 293, 302; 819 NW2d 82 (2012).

"Once a defendant raises the issue of self-defense and satisfies the initial burden of producing some evidence from which a jury could conclude that the elements necessary to establish a prima facie defense of self-defense exists, the prosecution must exclude the possibility of self-defense beyond a reasonable doubt." *People v Ogilvie*, 341 Mich App 28, 36; 989 NW2d 250 (2022) (quotation marks and citation omitted). By enacting the Self-Defense Act (SDA), MCL 780.971 *et seq*., our Legislature has codified the law regarding self-defense using deadly force and the duty to retreat. See MCL 780.972(1).[2] Under the SDA,

> (1) An individual who has not or is not engaged in the commission of a crime at the time he or she uses deadly force may use deadly force against another individual anywhere he or she has the legal right to be with no duty to retreat if . . . :

---

[2] "Deadly force" has long been defined as "where the defendant's acts are such that the natural, probable, and foreseeable consequence of said acts is death." *Ogilvie*, 341 Mich App at 38 (quotation marks and citation omitted).

(a) The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent death of or imminent great bodily harm to himself or herself or to another individual. [MCL 780.972(1)(a).]

Here, Robinson presented evidence that he had an honest and reasonable belief that Tinsley presented an immediate threat of death or great bodily harm. He contends that the prosecution failed to present sufficient evidence to disprove that he acted in self-defense. In support of his argument, he directs this Court to his own testimony that Tinsley pointed a gun at him, that she told his wife that she was going to kill him, and that he believed he was in imminent danger of death or serious bodily injury as a result of her actions. He also notes that Bonnett's testimony corroborated his version of the shooting.

We are, however, required to view the evidence in the light most favorable to the jury's verdict. See *Oros*, 502 Mich at 239. Contrary to the testimony from Robinson and Bonnett, Tinsley testified that, although she had a gun, she did not point it at Robinson. Instead, upon arriving at his house, she transferred the gun to her "fanny pack" so that it would be more secure. She did not remove it from the pack while she was there. Instead, she got into a physical altercation during which she was punched by Robinson and his girlfriend. Then, while she was leaving the property with Robinson's wife, she saw that Robinson had a gun. She recounted that he shot her six times while she was trying to leave. Robinson's wife's testimony corroborated Tinsley's version of the shooting. Additionally, Tinsley was shot under her left arm and in her lower back, consistent with her description of her body position when Robinson shot her. Finally, there was testimony that when the police responded to the scene in response to a "shots spotter" report, Robinson only stated that his wife's "male" friend had fired shots in the area. He did not state that he had fired his gun. Viewing this evidence in the light most favorable to the jury verdict, there is sufficient evidence to disprove self-defense.

## III. COERCED VERDICT

### A. STANDARD OF REVIEW

Robinson additionally argues that the trial court improperly coerced a guilty verdict when it responded to a request from the jury to have certain testimony read back to them. Alternatively, he contends that his defense lawyer was ineffective for failing to object to the coercive instruction. Because Robinson did not preserve his claim that the trial court coerced a guilty verdict, our review is for plain error affecting his substantial rights. See *People v Walker*, 504 Mich 267, 276; 934 NW2d 727 (2019). And because no evidentiary hearing was held, our review of his claim of ineffective assistance "is limited to mistakes that are apparent on the record." *People v Mack*, 265 Mich App 122, 125; 695 NW2d 342 (2005).

## B. ANALYSIS

A defendant is denied their right to a fair trial when the trial court "creates an atmosphere which seemingly requires a hasty verdict. . . ." *People v London*, 40 Mich App 124, 128; 198 NW2d 723 (1972).[3] Here, the jury requested to hear testimony from two witnesses read back to them. In response, the court advised that it would have to play back all of both witnesses' testimony back to the jury, so it would be unable to provide the requested testimony until the next day. The court further stated:

> Also, I need to tell you that I have commitments outside the courthouse this afternoon. So, if you have not reached a verdict by approximately 12:30, then you will be discharged until tomorrow, and I guess, that's okay because tomorrow, if you are still deliberating, we can start out tomorrow with the read back or the play back of the testimony that you say, you need.

Robinson contends that, in doing so, the court created an atmosphere which seemingly required the jury to return a hasty verdict or be faced with the prospect of returning the next day. He likens the circumstances in his case to the circumstances in the *London* case.

In *London*, the trial court told a jury that had already been deliberating for "nearly fourteen hours, out to deliberate under the threat that they [would] remain in deliberation until four o'clock in the morning if necessary." *Id*. (citations omitted). The trial court repeatedly tried to speed up the trial, including by telling both parties' lawyers: "We are going to stay here until this case is concluded, and I don't care if that takes until 4:00 o'clock in the morning, and you better start acting accordingly." *Id*. at 125-126 (quotation marks omitted). We conclude that the trial court's actions in this case are not akin to those of the court in *London*.

Instead, this case is more analogous to *People v Vettese*, 195 Mich App 235, 245; 489 NW2d 514 (1992). In *Vettese*, the trial court instructed the jury that "if you have not arrived at a verdict by 5:00, you will be excused and asked to report back here tomorrow morning at 8:30 and commence your deliberations. . . ." The *Vettese* Court concluded that the instruction did not deny the defendant a fair trial because the trial court did not suggest that the jury had to reach a verdict by 5:00. *Id*. Similarly, the trial court in this case merely told the jury their deliberations could only continue until 12:30 p.m., because the trial court had other commitments. Thus, instead of demanding that the jury quickly reach a verdict, the court indicated continued deliberations the next day were "okay because. . . we can start out tomorrow with the read back or the play back of the testimony. . . ." In doing so, the court did not deny Robinson a fair trial because it did not require that the jury had to reach a verdict by 12:30 p.m. See *id*. Moreover, given that the instruction was not coercive, Robinson's lawyer was not ineffective because he failed to object to it. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010) ("Failing to advance a

---

[3] Although we are not "strictly required to follow uncontradicted opinions from this Court decided before November 1, 1990, those opinions are nonetheless considered to be precedent and entitled to significantly greater deference than are unpublished cases." *Woodring v Phoenix Ins Co*, 325 Mich App 108, 114-115; 923 NW2d 607 (2018) (emphasis omitted).

meritless argument or raise a futile objection does not constitute ineffective assistance of counsel.").

Affirmed.

/s/ Matthew S. Ackerman
/s/ Michael J. Kelly
/s/ Colleen A. O'Brien